### McNEELY & PRICE CO. v. ELLERMAN & BUCKNALL S. S. CO., Limited, et al.

### The CITY OF WINDSOR.

### No. 381 of 1947, Admiralty.

United States District Court, E. D. Pennsylvania.

June 26, 1951.

Clark, Brown, McCown, Fortenbaugh & Young, Philadelphia, Pa., for libellant.

Rawle & Henderson, Philadelphia, Pa., for respondents.

KALODNER, Circuit Judge.

This is an action in admiralty to recover cargo damage. The cargo involved is three out of a total shipment of thirty-two bales of goatskins.

I find the facts as follows:

The thirty-two bales of goatskins were, for the purposes here, the property of the libellant. They had been properly cured and packed, and were shipped aboard the respondent's vessel, "City of Windsor", on August 26, 1946, at Karachi, India and stowed in the No. 2 'tween deck. About sixteen days later, when the vessel was at Calcutta, India, the bales were moved to the No. 1 shelter deck, and properly stowed. The vessel arrived at Pier 98, Philadelphia, Pa., on December 13, 1946, and discharged the bales some time prior to December 19, 1946, on which date they were taken by the libellant to its warehouse. The libellant set aside three bales as damaged. On December 27, 1946, and in January, 1947, the damaged bales were examined by surveyors, and the damage found to be one-third their value. The particular nature of the damage was deterioration of the skins or putrefaction, caused by wetting. The bales were varyingly wet on December 27, 1946, and water stains on the burlap coverings corresponded to the internal damage to a great degree. The bill of lading for the shipment of thirty-two bales acknowledged receipt in apparent good order and condition, except for rusty hoops; the bales in fact were not bound by metal hoops. The damage to the skins occurred after the bales were taken aboard the vessel at Karachi, and before they were discharged at Philadelphia. The

total damage amounted to $1,238.61, which represents the loss to the libellant.

■ The contested issue in this case is whether the damage occurred while the goatskins were within the care and custody of the respondent. I have found, in effect, that it did. The legal liability of the respondent is well settled, and I need not reiterate here the discussion contained in Roberts & Co. v. Calmar S. S. Corp., D.C. E.D.Pa.1945, 59 F.Supp. 203, and The Ciano, D.C.E.D.Pa.1946, 69 F.Supp. 35. The respondent here attempted, by way of exculpation, to show that it properly cared for and handled the cargo, and that the damage must have occurred before or after the skins were on board the vessel; and to put the libellant to proof that the skins were in fact in good order and condition when the vessel took them at Karachi, or the extent of the damage, if any, at the very date of discharge. See The Niel Maersk, 2 Cir., 1937, 91 F.2d 932; also George F. Pettinos, Inc., v. American Export Lines, Inc., D.C.Pa. 1947, 68 F.Supp. 759, affirmed 3 Cir., 1947, 159 F.2d 247. In my opinion it has not succeeded.

Mr. Meinell, an expert surveyor in whom I repose confidence, put the damage clearly within the vessel's responsibility to explain. Captain Robertson, another surveyor, who began as the respondent's witness and had represented the respondent at the surveys of December 27, 1946, and January, 1947, was somewhat wider in his opinion of the dates on which the damage could have been initiated. On the whole record, I am convinced that the damage could not have occurred after the skins left the vessel, not only because of Mr. Meinell's testimony, but also because Captain Robertson believed that in view of the degree of external rotting he had observed, it must have been earlier than two or three weeks before he examined the skins on December 27th, and that would put it before the skins left the vessel. Captain Robertson was uncertain

whether the internal wetting was old or not.

■ As to the earliest date on which the damage could have been initiated, Mr. Meinell believed that it was a month or five weeks prior to December 27th, when he first saw the skins. Captain Robertson estimated it at three to four months prior to December 27th, which is at best about the time the skins were taken aboard the "City of Windsor", or a month after, and I think the four month estimate is too extreme. The suggestion was made that the bales had been wet before being put aboard the vessel, had dried out, and were wet again. I do not believe this to have been the case: As I have found, the internal damage corresponded with the external wetting as manifested by the stains on the burlap, and yet the bill of lading acknowledged receipt in apparent good order and condition. While Captain Robertson, it is true, was inclined toward a low opinion of those who do the examining, Mr. Rigg, the Chief Mate of the "City of Windsor", said he looked at this shipment himself; that it had been passed by two checkers and the third officer, and that if the burlap had appeared used or stained a notation to that effect would have been placed on the bill of lading.[1] The laxity of those whose responsibility it is, on the ship's behalf, to examine the cargo received may explain how damaged cargo is accepted, but it does not create an inference, to begin with, that the goods were damaged, nor in my opinion is it alone sufficient to relieve the vessel of its receipt. To hold otherwise would make a mockery of the requirements of the Carriage of Goods by Sea Act, § 3(3)(c), 46 U.S.C.A. § 1303(3)(c). The instant case, it should be noted, differs from The Niel Maersk and Roberts & Co., Inc., v. Calmar S. S. Co. in that we are not dealing with latent defects, but with defects apparent on the face of the cargo, as in The Ciano, for I have found that the external water stains coin-

1. There is also in evidence the following answer by the respondent to the libellant's interrogatory 1(b), which relates to the time of delivery of the cargo to the vessel: "The bales were examined by libellant's Tally Supervisor in conjunction with the ship's officers and were found externally in good order and condition. * * * "

cided with the internal damage. Further, I have found that the damage occurred while the bales were within the care and custody of the vessel, a finding of fact I believe fully justified on the whole record.

 Accordingly, the respondent has the burden of proof "to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage." Carriage of Goods by Sea Act, § 4(2)(q), 46 U.S.C.A. § 1304(2)(q). The respondent has attempted to show that at all times it handled and cared for the cargo properly and without fault or neglect. Captain Robertson said that the kind of wetting the bales involved here suffered could not have occurred in the shelter deck because he had examined the hold and found no evidence of water or sweat. Of course, he missed the wet bales we are discussing, and on his own testimony the external damage was present at the time of discharge. He also testified that the outside skins showed dunnage marks, and that putrefaction was present where the pressure of the bales against the dunnage had squeezed the moisture into the areas of the outside skins overlaying the dunnage interstices; there must have been some evidence on the dunnage that damage existed in the hold. It is recognized that this is no reflection upon Captain Robertson, for it is not possible to find every indication of damage. Even so, the acceptance of Captain Robertson's conclusion would not decide the case. The cargo had first been stowed in the No. 2 'tween deck, and then was removed at Calcutta to the No. 1 shelter deck. The record does not show with any satisfaction the conditions of the No. 2 'tween deck. Mr. Rigg testified, by deposition, that the No. 2 'tween deck contained no oil or mud, and he said it was usual to clean the holds after discharge, but there is no evidence as to that hold comparable to Captain Robertson's testimony as to the No. 1 shelter deck. I am not persuaded, and I do not believe, that the respondent has borne its burden of proof in this case.

Cf. The George E. Pickett, D.C.S.D.N.Y. 1948, 77 F.Supp. 988.

██ For these reasons, I conclude that the respondent must answer in damages. The libellant proved the invoice price of the skins involved, and in fact proved to my satisfaction that the goatskins were worth $1 more per dozen at the place of discharge, Philadelphia; nevertheless, it does not ask for the dollar. Since the evidence is uncontradicted that the depreciation was one-third the value of the three bales, the libellant is entitled to recover the sum of $1,238.61, the total invoice price for the three bales being $3,715.83. The respondent disputes this on the theory that the libellant is a processor of raw skins and makes its profit out of the finished product, but there was no evidence, indeed it was concededly unascertainable, what profit the libellant lost on its finished product. To sustain this argument legally, the respondent relies upon the phrase "actual loss" used in Continental Distributing Co. v. Reading Co., 3 Cir., 1948, 168 F.2d 967, 971. I think the phrase was taken out of the context of the decision of the Court of Appeals, and that the holding of the case is not inconsistent herewith. I have no doubt that I have employed the proper measure of damages in the circumstances of this case. Illinois Cent. R. Co. v. Crail, 1930, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699; Pioneer Import Corp. v. The Lafcomo, 2 Cir., 1947, 159 F.2d 654, 655, certiorari denied Black Diamond Lines v. Pioneer Import Corp., 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063; Weirton Steel Co. v. Isbrandtsen-Moller Co., 2 Cir., 1942, 126 F.2d 593; Carver's Carriage by Sea, Section 721 (8th ed. 1938). The evidence was that the three bales in controversy had depreciated in value by one-third, and plainly the libellant as a processor is entitled to damages measured by the ordinary rule since it had to pay for its raw material the additional difference between the price of all good, and some putrified and damaged, skins.

For the reasons stated, the libellant may present to the Court a judgment order in its favor in the amount indicated above.